USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4 | 7 | 11

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

THOMAS KELLY,                                                :

                    **Petitioner,**            :

           - against -                          :

SUPERINTENDENT LEMPKE,                    :

                    **Respondent.**          :

**REPORT AND**
**RECOMMENDATION**

**08 Civ. 8241 (BSJ) (RLE)**

**To the HONORABLE BARBARA S. JONES, U.S.D.J.:**

## I. INTRODUCTION

*Pro se* Petitioner Thomas Kelly, a New York state prisoner at Five Points Correctional

Facility, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. On August 7, 2000, Kelly

was convicted in New York County of murder in the second degree (N.Y. Penal Law § 125.25

[1]) after a jury trial, and was sentenced to an indeterminate term of twenty-two years to life

imprisonment. Kelly delivered his petition to prison officials on August 12, 2008, and it was

received by the *Pro Se* Office in this District on August 29, 2008. Kelly contends that his

incarceration violates the United States Constitution because (1) he received ineffective

assistance of counsel; (2) the evidence introduced at trial was legally insufficient to support his

conviction; (3) a court officer's unauthorized jury room bayonet demonstration violated his right

to trial by jury and a fair trial; (4) the trial court failed to make a full record of its interactions

with the deliberating jury; and (5) improper expert witness testimony was introduced at trial.

(Petition under 28 U.S.C. § 2254 ("Pet.") ¶ 13.) Kelly requests that the Court either grant his

petition, or, in the alternative, hold an evidentiary hearing. (*See* Pet'r's Reply to Resp't's

Answer.) For the reasons set forth below, I recommend that the petition be **DENIED**.

## II. BACKGROUND

### A.   Factual Background

In July 1997, Dawn Kaye ended her relationship with Kelly, whom she had dated since 1993, and moved in with her father, William Hageman, who was the live-in superintendant at 201 East 12th Street in Manhattan's East Village. (Tr. at 112-14.) The week after Kaye left him, Kelly created several reasons to contact Kaye, but she rejected his attempts at reconciliation. (*Id.* at 115-17.) On July 29, 1997, Kelly telephoned Hageman, asking to speak to Kaye, and Hageman, knowing that Kaye did not want to speak to Kelly, told him that she wasn't at home. (*Id.* at 116.) At approximately 10:30 p.m., as Kaye and Hageman were leaving their apartment, Kelly approached them from across the street. (*Id.* at 118, 633.)

Kelly and Kaye had a brief conversation, where Kaye told Kelly that she did not want to be with him anymore. (*Id.* at 119.) In response, Kelly told her that he was going to tell her father that she was a prostitute. (*Id.* at 120.) Kelly proceeded to approach Hageman, who was standing with his back to the front door of the apartment building, and told him that Kaye was involved in prostitution. (*Id.*) Hageman told Kelly that he "didn't care," and that Kelly should leave him and his daughter alone. (*Id.* at 122, 640-41.) Kelly became upset, and Hageman told Kaye to call the police. (*Id.* at 123, 645.)

As Kaye was about to enter the building, she thought she saw Kelly push or grab Hageman. (*Id.* at 124.) She was approximately two feet away from them, and when she looked closer, she saw Kelly remove a bayonet blade from her father's chest as Kelly pulled away from him. (*Id.* at 124, 127.) She saw Hageman try to reach for a knife that he carried in a sheath on his belt, but he collapsed to the ground before he could withdraw it. (*Id.* at 130.) Kaye testified that

after Kelly removed the bayonet, he said: "There, now, I killed your father." (*Id.*) Kelly then started walking away from the scene, breaking into a run as he headed down the street. (*Id.*)

In addition to Kaye, a number of other witnesses, from various locations on the street, saw the incident. Robert Gengerki heard Kelly and Hageman arguing from across the street as he was walking home. (*Id.* at 411.) Gengerki saw Kelly shove Hageman backward into the door of an apartment building, and then heard Hageman tell Kaye to call the police. (*Id.* at 414.) As Gengerki walked across the street to stop the fight, he witnessed Kelly bring a nine-inch long knife up to Hageman's chest, make a motion upward, and then walk away from the scene while Hageman fell to the ground, bleeding profusely. (*Id.* at 419.)

Four other witnesses confirmed Gengerki's account of the incident, although the witness accounts differed with regard to some of the details of the attack. Three witnesses saw Kelly make a punching motion toward Hageman, but they did not see a knife in Kelly's hands. (*Id.* 43, 230-33, 501.) Another witness testified that she saw Kelly shove Hageman with all the force in his body, and then walk by her carrying a "long bloody knife in his hand." (*Id.* 446-48.) Although Gengerki was not able to identify Kelly in a line-up following the incident, two other witnesses identified Kelly as the man they saw attacking Hageman. (*Id.* at 426, 452, 505.)

Another witness, Moses Pardellas, saw a man, whom she later identified as Kelly, kneeling on the street, wiping a knife with a piece of paper. (*Id.* at 269-70.) As she continued walking, she found Hageman on the ground bleeding, and Kaye, on her knees screaming that her father had been stabbed. (*Id.* at 271-72.) When Pardellas described the man she had seen with the knife, Kaye told her that she had seen Kelly, and that he was the man who had stabbed her father. (*Id.*)

3

After the stabbing, several eyewitnesses called 911. Medical personnel transported Hageman to Beth Israel hospital where he was pronounced dead. (*Id*. at 699.) A medical examiner testified that Hageman died as a result of a stab wound to his chest that was two and one-half inches in depth and penetrated his heart. (*Id*. at 190-94, 294-95.) The path of the wound was "straight" and "slightly downward" indicating little movement in Hageman's body when the knife penetrated him. (*Id*.)

When Hageman was lifted from the ground at the scene, a knife belonging to him was recovered from where he had been lying. (*Id*. at 548-57.) When officers searched the scene for evidence, a cardboard sheath wrapped in electrical tape was found on the ground a block from Hageman's building, along with a blood-stained menu, which Paradellas identified as the piece of paper she saw Kelly use to wipe the knife. (*Id*. at 276-66, 369-71.) The bayonet blade was retrieved from a sewer drain a couple of blocks from the scene after an officer noticed blood next to the drain. (*Id*. at 300-04, 321-22.)

Meanwhile, a uniformed police officer received a radio dispatch about the incident, and saw Kelly, who appeared to match the description of the perpetrator. (*Id*. at 480.) The officer identified himself, withdrew his gun, and told Kelly not to move. (*Id*.) Kelly turned around and told the officer: "I did it, you got me, I'm the one you're looking for." (*Id*.) Shortly thereafter, a detective took Kaye and Pardellas to Kelly's location, where Kaye identified him as the person who stabbed her father, and Pardellas identified him as the man she had seen wiping a knife. (*Id*. at 133, 275.)

According to Kelly, he originally bought the bayonet for Kaye in 1995 because he was concerned about her safety when she was alone in their apartment. (*Id*. at 619-20.) In July 2007, Kelly began to suspect that Kaye was engaged in prostitution because she suddenly had extra

money to spend, and when he confronted her about it, telling her that it could not continue, she moved out of their apartment. (*Id.* at 604-06.) When Kelly learned that Kaye was living with her father, he became concerned because Kaye had told him that her father had sexually molested her years earlier. (*Id.* at 160, 606-08.) After Kaye refused to speak with him on the telephone, Kelly decided to bring her the bayonet he had given her as an excuse to see her. (*Id.* at 628-29.) Kelly put the bayonet in a sheath, tucked the sheath into his waistband, and covered both items with his shirt. (*Id.* at 630-31.) He then walked to Hageman's apartment, and called Kaye from a payphone across the street. (*Id.*) Hageman answered the phone, and Kelly told him to tell Kaye that he was waiting for her across the street. (*Id.*)

When Kelly saw Hageman and Kaye emerge from the building, he approached them, introduced himself to Hageman, and asked to speak with Kaye. (*Id.* at 633-34.) Kelly and Kaye spoke briefly; Kelly warned her that he was going to tell Hageman about her prostitution, and Kaye said that she didn't care. (*Id.* at 637-41.) Kelly proceeded to tell Hageman, and an argument between the two ensued, culminating in Hageman telling Kaye to call the police and telling Kelly to leave. (*Id.*) Kelly stated that he would leave, but before he left he wanted to give the bayonet to Kaye, and he told Hageman: "This belongs to Dawn, and living with you she is going to need this." (*Id.* at 646, 648.) As Kelly removed the bayonet and sheath from his waistband, Hageman grabbed the handle of the bayonet, and Kelly tried to stop him from withdrawing it. (*Id.* at 645-55.) With his right hand, Hageman took control of the bayonet and pointed it at Kelly. Kelly, using both hands, grabbed Hageman's right hand and pushed Hageman's wrist so that the bayonet faced Hageman. (*Id.* 654-60.) After Kelly turned Hageman's wrist, Hageman cried out and released his grip on the knife. (*Id.*) Kelly did not realize that Hageman had been stabbed, and when he noticed a spot of blood appear on

Hageman's shirt, he cried in disbelief, "Oh, my God . . . I just killed your father." (*Id.* at 661,

714.) He walked away from the scene and put the bayonet blade in the drain because he was

concerned that children might come upon it if he left it in a trash can. (*Id.* at 666-70.)

Kelly's trial began on April 27, 2000, and was presided over by Judge Bruce Allen.

Kaye, Pardellas, Gengerki, four other eyewitnesses, along with a number of other police and

medical witnesses testified for the prosecution, and the prosecution argued that Kelly

intentionally killed Hageman. Kelly testified for the defense, and the defense argued that the

stabbing was accidental.

Jury deliberations began on May 4, 2000.[1] Prior to deliberations, the parties consented to

allow trial exhibits to be given to the jurors whenever they requested them, and the judge

instructed the jury to submit written notes if they had any questions. (*Id.* at 814-15, 909-10.) On

the third day of deliberations, a court officer brought the bayonet and sheath into the jury room in

response to a written jury request to see them. When the jurors sought to handle the bayonet, the

officer refused out of a concern for the jurors' safety. After some initial hesitation, the officer

agreed to the jurors' request that he remove the bayonet from the sheath. These jurors wanted to

test Kelly's testimony that Hageman pulled the bayonet from Kelly's belt:

> We wanted to see for ourselves if the bayonet would come out of its sheath when
> grabbed by the handle, as [Kelly] had described Mr. Hageman's actions in his
> testimony. Some jurors thought that the sheath was so tight that both the bayonet and
> sheath would come out of the waistband together if grabbed by the handle.

(Respondent's Appendix in Supp. of Answer Opposing Pet. ("RA"), Ex. N, A197 ("Prettyman

Aff.") ¶ 5.) The officer placed the bayonet and sheath in his belt and attempted to pull the

bayonet by the handle while dislodging it cleanly from the sheath. (*Id.* ¶¶ 5-7.) The officer then

---

[1] The following summary of the jury deliberations is based on the trial record and the expanded record developed in connection with Kelly's first N.Y.C.P.L. § 440 motion. Kelly supplemented his post-judgment submissions with affidavits from two jurors, Charles Fernandez and Michael Prettyman, as well as a letter that Fernandez wrote to the trial judge following the verdict.

answered several juror questions about the demonstration, informing the jury that the bayonet "easily" slid from the sheath. (Pettyman Aff. ¶¶ 5-7; RA, Ex. N, A102-93 ("Fernandez Aff.") ¶¶ 4-6.) The officer was asked by the jurors if he had any military training and whether he was holding the bayonet according to proper military procedure. (Fernandez Aff. ¶ 6.) The officer stated that he had not received military training, but that the way he held the bayonet was the proper way to do it. (*Id.*) In response to another question, the officer stated that the belt was not too tight around the sheath. (*Id.*)

After the demonstration, the court officer reported the incident, and Judge Allen advised both parties about what had happened. Although these initial discussions were not put on the record at trial, the prosecution and the defense were in accord about what happened in the courtroom following the demonstration at a post-conviction proceeding. In the presence of both attorneys and Kelly, Judge Allen relayed the court officer's report about his interactions with the jury. Judge Allen informed the parties that "some jurors [had] asked the officer to place the sheathed bayonet in his belt and pull the bayonet out of its sheath." (RA, Ex. N, A219 ("Pouge Aff.") ¶ 10; RA, Ex. N, A203 ("Walsh Aff.") ¶ 4.) According to Judge Allen, the officer had told him that he had drawn the bayonet from the sheath and then had "answered some juror questions about the demonstration." (*Id.*) Defense counsel, after consulting with Kelly, agreed to a curative instruction that Judge Allen would read to the jury, and he did not request a mistrial. (Walsh Aff. ¶ 4.) Following the consent of both parties, Judge Allen read the following instruction to the jury: "Any demonstrations by court officers in the jury room, with the evidence, must be disregarded by you and must play no part whatsoever in your deliberations." (Tr. at 954.)

After the court's instruction, the jury continued deliberations and ultimately found Kelly guilty of murder in the second degree on May 8, 2000. Prior to sentencing, juror Charles

Fernendez sent Judge Allen and Kelly a letter, stating that he believed that the jury had convicted

Kelly on the wrong charge, and that if they had received more information, they would likely

have convicted him on a lesser charge. (RA, Ex. N., A293-95 ("Fernandez's June 9, 2000

Letter").)[2] Following the letter, defense counsel requested an adjournment to consider possible

N.Y. Crim. Proc. § 330.30 (motion to set aside verdict) and N.Y. Crim. Proc. § 440.10 (motion

to vacate judgment) motions. Sentencing was adjourned to August 7, 2000, at which time Judge

Allen sentenced Kelly to twenty-two years to life in prison. (Tr. vol. 3, Sentencing Transcript at

24.) Kelly made a verbal application for reassignment of counsel because of ineffective

assistance of counsel. (*Id.* at 3.) Judge Allen denied Kelly's application for reassignment of

counsel, and told Kelly he could properly raise the issue in a § 440.10 motion. (*Id.* at 9.)

## B.  Procedural History

### 1.      Kelly's First N.Y. Crim. Proc. § 440.10 Motion

On July 23, 2002, Kelly filed a motion to vacate the judgment pursuant to N.Y.

Crim. Proc. § 440.10, claiming that the court officer's bayonet demonstration violated Kelly's

right to a fair trial by (1) usurping a judicial function and (2) violating Kelly's right to be present

during a material stage of the trial, in violation of due process of law. Kelly further argued that

these errors affected "the organization of the court or the mode of proceedings" such that

appellate review was required.

---

[2] Fernandez's June 9, 2000 letter to Judge Allen and Kelly was primarily a plea for sentencing leniency. Fernandez cited several pieces of information from the trial and his own investigation which he believed would have reduced Kelly's conviction to voluntary manslaughter. Fernandez's letter stated that: (1) the medical examiner's testimony was inconclusive and misleading; (2) the fact that Kelly's trial was delayed three years caused the juror's to believe that he spent that time fabricating his story when, in fact, Kelly told the same story to his defense counsel days after the stabbing, which was unknown to the jurors; (3) the suppressed fact that the victim was a former police officer released for behavioral issues, which made Kelly's claim of a struggle over the bayonet more believable because the victim was trained in combat; and (4) when he visited the crime scene after the trial, Fernandez realized that the door at 201 East 12th Street was different than the trial descriptions, which undercut eyewitness testimony.

Judge Allen held an evidentiary hearing, and, on October 16, 2002, rejected Kelly's claims and denied the motion to vacate. (RA, Ex. N, 352-59.) In rejecting Kelly's claims, the court found that even though the court officer erred by not immediately notifying the court about the jury's request, the court's curative instruction nullified the violations by providing the defense an immediate remedy. (*Id.* at 355-57.) The court further found that Kelly's right to be present at a material stage of the proceedings was not violated because the defense had "a meaningful opportunity to participate in formulating the court's response" to the errors. (*Id.* at 356-57.) The court additionally held that the court officer's violations did not fit within the "mode of procedure" exceptions that allow unpreserved objections to be raised post-conviction. (*Id.*) As a result, the court found that Kelly could not raise the violations because they were unpreserved and therefore waived. (*Id.* at 357-58.)

### 2.   Direct Appeal

On December 3, 2002, Kelly filed a consolidated appeal, including a direct appeal of his conviction and an appeal of the denial of his § 440.10 motion. Kelly raised the following four claims: (1) that the weight of the evidence did not establish beyond a reasonable doubt that Kelly intended to kill Hageman; (2) that the court officer's conduct in the jury room, including the officer's refusal to relinquish control of the bayonet and sheath to jurors and his subsequent demonstration with those items, resulted in a delegation and usurpation of judicial authority and made the officer an unsworn witness; (3) that his right to be present for a material stage of the trial was violated by the court officer's encounter with the jury; and (4) that his sentence was excessive. (RA, Ex. A.)

Kelly filed a *pro se* supplemental brief on October 3, 2003, contending that the trial court's "failure to make a full record of the deliberating jury" (a) violated his "fundamental right

to 'notice' and 'response' to the deliberating jury's request for information," (b) deprived him of "full knowledge of the court officer's demonstration at the time of the curative instruction," and (c) deprived him of "adequate and fair appellate review by not recording his objection to the court officer's demonstration, in violation of due process of law" under the federal and New York constitutions. (RA, Ex. D.)

On August 19, 2004, the Appellate Division unanimously affirmed the judgment of conviction and Judge Allen's order denying Kelly's motion to vacate the judgment. *People v. Kelly*, 11 A.D.3d 142 (1st Dept. 2004). The Appellate Division held that the officer's refusal to relinquish control of the bayonet to the jury was a ministerial act; that the officer did nothing in the jury room that usurped a judicial function; and that the trial judge maintained supervisory control over the proceedings. *Id.* at 143-44. The court further concluded that the officer's demonstration with the bayonet and sheath was akin to a jury room experiment, which, if improper, was ordinary trial error. *Id.* at 145-46. The court held that Kelly, having agreed to a curative instruction to disregard the demonstration, waived any claim of error resulting from the demonstration. *Id.* at 145. The court further held that Kelly had no right to be present in the jury room when the court officer delivered the bayonet because it was part of the jury deliberations, and Kelly therefore was not denied his right to be present at a material stage of the trial. *Id.* Finally, even if Kelly had preserved the error, the court found that he could not establish that the demonstration prejudiced the trial's outcome as is required when extra-record material enters jury deliberations. *Id.* The court also reviewed Kelly's other claims and determined that they were meritless without providing a written review. *Id.* at 148.

Leave to appeal to the New York Court of Appeals was granted on November 2, 2004, and, in his appeal, Kelly claimed that the officer's refusal to allow the jurors to handle the knife

usurped a non-delegable judicial function, and that the court's conduct in response amounted to a delegation of the judge's supervisory authority over the trial. (RA, Ex. E.) Kelly further argued that his constitutional right to trial by jury was violated, that his right to be present at trial was violated, and that the demonstration violated his right of confrontation. (*Id.*) The court unanimously affirmed the First Department's decision on June 29, 2005. *People v. Kelly*, 5 N.Y.3d 116 (2005). The court held that Kelly had failed to preserve his claims regarding the court officer's jury demonstration and the trial court's response to it. *Id.* at 120-21. The court also held that all of Kelly's other contentions raised in his brief were without merit. *Id.* Kelly's *pro se* motion seeking reargument was submitted to the Court of Appeals on August 29, 2005, (RA, Ex. K), and was denied on October 20, 2005. (RA, Ex. M.)

### 3.   Kelly's Second N.Y. Crim. Proc. § 440.10 Motion

Following Kelly's direct appeal, he filed a second § 440.10 motion on October 14, 2006, claiming that he received ineffective assistance of counsel because his trial counsel did not: (i) properly cross-examine the State's medical expert witness; (ii) investigate the crime scene; (iii) visit him in jail; (iv) interview two State witnesses who were not called at trial; and (v) properly investigate and preserve objections to the bayonet demonstration. On October 11, 2007, the trial court rejected Kelly's claim on the merits. On May 27, 2008, Kelly's leave to appeal to the Appellate Division was denied. On June 18, 2008, he submitted a letter to the Court of Appeals, appealing the Appellate Division's denial of leave to appeal the Supreme Court's denial of the § 440.10 motion. On August 8, 2008, the Court of Appeals informed Kelly that the Appellate Division's denial of his motion was not appealable. Kelly delivered the instant petition to prison officials on August 12, 2008, and it was received by the *Pro Se* Office in this District on August 29, 2008.

### III. Discussion

**A.     Threshold Issues**

**1.     Timeliness**

A petitioner must file an application for a writ of habeas corpus within one year of his conviction becoming final. *See* 28 U.S.C. § 2244(d)(1). A conviction becomes final " 'when [the] time to seek direct review in the United States Supreme Court by writ of certiorari expires;' that is, ninety days after the final determination by the state court." *Williams v. Artuz*, 237 F.3d 147, 150 (2d Cir. 2001) (quoting *Ross v. Artuz*, 150 F.3d 97, 98 (2d Cir. 1998)). The statute of limitation is tolled while state court relief is pending. 28 U.S.C. § 2244(d)(2). The tolling period runs from when the post-conviction motion is filed until leave to appeal is denied. *See Rodriguez v. Portuondo*, No. 01 Civ. 547 (GEL), 2003 WL 22966293, at *1-2 (S.D.N.Y. Dec. 15, 2004). A *pro se* petition is deemed "filed" on the date it was given to prison officials for mailing. *Houston v. Lack,* 487 U.S. 266, 270 (1998); *Harris v. Senkowski*, 298 F. Supp. 2d 320, 335 (E.D.N.Y. 2004).

Kelly's conviction became final on January 18, 2006, ninety days after the denial of his properly filed motion for reargument of the Court of Appeals's decision affirming his conviction. *See Smalls v. Smith*, No. 05 Civ. 5182 (CS), 2009 WL 2902516 (S.D.N.Y. Sept. 10, 2009) (holding that the limitations period was properly tolled during the pendency of petitioner's motion for reargument of the Appellate Division's denial of his application for leave to appeal because a motion for reargument could properly be sought under New York law). On October 14, 2006, 269 days after his conviction became final, Kelly filed a § 440.10 motion, which was denied. On May 27, 2008, the Appellate Division refused to grant Kelly's leave to appeal the denial of his § 440.10 motion. Seventy-seven days later, on August 12, 2008, Kelly gave the

instant petition to prison officials for mailing. Excluding the time that Kelly's second § 440.10

motion was pending, his petition was filed 346 days after his conviction became final, and is

therefore timely.

### 2.     Exhaustion

Pursuant to 28 U.S.C. § 2254(b), a petitioner must exhaust his constitutional claims in

state court before proceeding with them to federal court. *See* 28 U.S.C. § 2254(b)(1)(A); *Picard*

*v. Connor*, 404 U.S. 270, 275 (1971). There are two prongs to this requirement. To satisfy the

procedural prong, a petitioner must have utilized all available avenues of appellate review within

the state court system. *Bossett v. Walker*, 41 F.3d 825, 828 (2d Cir. 1994). To satisfy the

substantive prong, a petitioner's claims in state court must have been raised in federal law or

constitutional terms. *Jones v. Vacco*, 126 F.3d 408, 413 (2d Cir. 1997) (quoting *Daye v. Attorney*

*Gen.*, 696 F.2d 186, 191 (2d Cir. 1982) (*en banc*)).

Kelly's claims regarding the jury demonstration and his ineffective assistance of counsel

are exhausted. Kelly's claims regarding the jury demonstration were raised on direct appeal, and

the Appellate Division's denial of the claim was upheld by the Court of Appeals. Kelly raised his

ineffective assistance of counsel claim in his second § 440.10 motion, and he fully exhausted

state court review of that motion.[3]

Kelly's claim that his conviction was based on legally insufficient evidence is

unexhausted. Kelly raised the claim in his direct appeal brief. (*See* RA, Ex. A (Direct Appeal

Brief) at 26.)[4] The Appellate Division denied the claim without providing a written review. *See*

---

[3]The Court notes that Kelly's claim that the trial court improperly admitted expert witness testimony was never
raised on appeal, and is therefore unexhausted. Kelly did, however, claim that his trial counsel failed to object to the
introduction of the evidence as part of his exhausted ineffective assistance of counsel claim. Accordingly, the Court
will review Kelly's claim regarding the medical testimony as part of Kelly's ineffective assistance of counsel claim.
[4]Kelly claims that his conviction was against the "weight of the evidence." (Pet'r's Mem. at 17.) A federal court
does not have the power to review a true "weight of the evidence" claim in a habeas proceeding because such a

*Kelly*, 11 A.D.3d at 148. Kelly did not appeal that determination to the Court of Appeals, and the claim is therefore unexhausted. Kelly's claim that the trial court failed to make a record of the discussions regarding the jury demonstration is similarly unexhausted. Although Kelly raised the claim in his supplemental brief on direct appeal, he failed to seek review of the Appellate Division's denial of the claim to the Court of Appeals. Although his legal sufficiency claim and his claim regarding the failure of the trial court to make a record are unexhausted, the Court recommends that the claims be dismissed on the merits, as will be discussed below, pursuant to 28 U.S.C. § 2254(b)(2).

### 3.    Procedural Bar

A claim is procedurally precluded from habeas review if (1) the state court declined to address the petitioner's federal claim because petitioner failed to meet a state procedural requirement and (2) the state court decision rested on an independent and adequate state ground. *Coleman v. Thompson*, 501 U.S. 722 (1991); *Jones*, 126 F.3d at 414 (citing *Elman v. Davis*, 42 F.3d 144, 147 (2d Cir. 1994)). A state law ground is "adequate" if "the state's insistence on compliance with its procedural rule serves a legitimate state interest." *Wainwright v. Sykes*, 433 U.S. 72, 83, n.8 (1977) (quoting *Henry v. Mississippi*, 379 U.S. 443, 447 (1965)). A petitioner can overcome this procedural bar if he can show cause for the default and actual prejudice, or "demonstrate that failure to consider the claim will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750 (internal citations and quotations omitted).

Respondent contends that Kelly's claims regarding the circumstances surrounding the jury demonstration are procedurally barred because they were decided on independent and

---

claim is grounded entirely in state law and does not implicate a federal constitutional right. *See People v. Bleakley*, 69 N.Y.2d 490, 492-95 (1987); *Douglas v. Portuondo*, 232 F.Supp.2d 106, 116 (S.D.N.Y. 2002). Nonetheless, given Kelly's reference to federal law and the requirement that *pro se* pleadings be construed liberally, the Court will construe Kelly's claim as also challenging the legal sufficiency of the evidence.

adequate state law grounds. (Resp't's Mem. at 48.) The Court of Appeals held that Kelly had failed to preserve his claims because he failed to object to the jury demonstration when he learned about it and he consented to the trial court's curative instruction. *Kelly*, 5 N.Y.3d at 121 ("In all, the impropriety was protestable but unprotested, curable and cured.") The Court of Appeals also determined that the procedural rule did not constitute a "mode of procedure" error, an exception to New York's preservation rule, which allows the court to review procedural errors that implicate the integrity of the judicial process itself. *Id.* at 119-121.

It is well-settled that New York's preservation rule typically constitutes an independent and adequate state procedural ground on which to deny a defendant's appeal. *See Kemp v. New York*, No. 07 Civ. 6996 (RMB)(HBP), 2009 WL 306258, at *9 (S.D.N.Y. Feb. 9, 2009) (citing *Garcia v. Lewis*, 188 F.3d 71 (2d Cir. 1999); *Glenn v. Bartlett*, 98 F.3d 721, 724-25 (2d Cir.1996). Kelly contends that the preservation rule should not apply in this case because the court's error constituted a "mode of proceedings" violation. (*See* Pet'r's Reply at 4.) Although a claim that a trial judge completely abdicated control of trial would constitute a mode of procedure error not subject to the contemporaneous error rule, the Court of Appeals appropriately concluded that Judge Allen did not abdicate control of the proceedings, and took proper curative action when he learned of the court officer's actions. *See Kelly*, 5 N.Y.3d at 119-21. Judge Allen had the final word with regard to the jury demonstration when he instructed the jury to disregard the demonstration, and did not abdicate control over the proceedings. The Court finds that the Court of Appeals reasonably applied the contemporaneous objection rule to this case, and that Kelly's claim is therefore procedurally barred because it was decided on an independent and adequate state law ground.

15

Kelly has not made a showing sufficient to overcome this procedural bar. He argues that his trial counsel was ineffective for failing to object to the court's curative instruction, and that this failure should constitute cause sufficient to overcome the procedural bar. (Pet'r's Mem. at 16.) In order for ineffective assistance of counsel to constitute cause sufficient to overcome a procedural bar, trial counsel's ineffectiveness must itself rise to the level of a constitutional claim. *See Edwards v. Carpenter*, 529 U.S. 446, 451-52 (2000); *Murray v. Carrier*, 477 U.S. 478, 488-89 (1986). As will be discussed below, the Court finds that Kelly's ineffective assistance of counsel claim is meritless, and it cannot therefore constitute cause for his procedural default.

Kelly additionally argues that his failure to object to the demonstration should be excused because neither trial counsel nor the court informed him about the "true jury room demonstration." (Pet'r's Mem. at 16.) No contemporaneous record was made of the proceedings following the court's discovery of the demonstration, but counsel for the defense and prosecution both submitted affidavits stating that Kelly was present when Judge Allen informed them of the demonstration. (Pouge Aff. ¶ 10; Walsh Aff. ¶ 4.) Although it appears that Kelly was informed that the officer conducted the bayonet demonstration and answered questions from the jury, it does not appear that Kelly was informed about certain facts about the demonstration. For example, it does not appear that Kelly was informed about the jurors' questions regarding the officer's military training and whether Kelly pulled the knife according to military procedure. Nevertheless, the Court finds that Kelly's lack of notice about particular details about the demonstration does not constitute cause sufficient to overcome the procedural bar. Kelly had notice of the essential facts that the demonstration had occurred and that the officer had answered questions posed by the jurors.

16

Kelly has also failed to demonstrate that the court's failure to consider the claim will "result in a fundamental miscarriage of justice, i.e., that he is actually innocent of the crime for which he has been convicted." *Dunham v. Travis*, 313 F.3d 724, 730 (2d Cir. 2002) (citing *Schlup v. Delo*, 513 U.S. 298 (1995)). To establish actual innocence, "a habeas petitioner must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Id.* Kelly has not presented any new evidence that he is actually innocent, and has not shown that it is more likely than not that a jury would have not convicted him had the demonstration not occurred. Accordingly, Kelly has failed to establish cause excusing his procedural default, and the Court finds Kelly's claims associated with the jury demonstration are procedurally barred. Therefore, the Court recommends that these claims be **DISMISSED** with prejudice.

## B. Merits of the Claims

### 1. Standard of Review

The Antiterrorism and Effective Death Penalty Act constrains a federal court's ability to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. The Act limits issuance of the writ to circumstances in which the state adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *see Williams v. Taylor*, 529 U.S. 362, 412 (2000). A state court decision is contrary to federal law if the state court applies a "conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 413. Furthermore, in cases where the state court decision rests on a factual

17

determination, the federal court must find that the "decision . . . was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

### 2.    Kelly's Ineffective Assistance of Counsel Claim

Generally, to prevail on an ineffective assistance of counsel claim, a petitioner must satisfy the two-pronged test articulated in *Strickland v. Washington*, 466 U.S. 668 (1984). First, the petitioner "must show that trial counsel's performance was deficient." *Id.* at 687. The proper standard for attorney performance is that of reasonableness under prevailing professional norms and circumstances. *Id.* at 688-89. Second, the petitioner "must show that the deficient performance prejudiced the defense." *Id.* at 687. This requires a showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Consideration must also be given to counsel's overall performance; otherwise, it would be too simple to prove that an attorney's specific act or omission was proof of ineffective assistance. *Kimmelman v. Morrison*, 477 U.S. 365, 386 (1986).

Kelly argues that his trial counsel provided ineffective assistance of counsel because he failed to: (1) prepare for trial; (2) strike improper expert opinion testimony; (3) call a forensic expert as a defense witness; (4) object to, and make a factual record of, the improper jury demonstration; and (5) properly prepare a post-conviction motion objecting to the jury room demonstration. (Pet. ¶ 13.)

As an initial matter, a review of the trial record demonstrates that trial counsel's overall conduct at the trial was not deficient. In the face of significant evidence that indicated that Kelly intentionally stabbed Hageman, counsel ably cross-examined the eyewitnesses and the medical

18

examiner, establishing inconsistencies between the various accounts of how the stabbing occurred.  In summation, counsel competently highlighted these inconsistencies, noting how some witnesses said that Kelly swung the bayonet above his shoulder, and another stated that his arm did not go that high. Counsel noted that the eyewitness accounts were not consistent with the medical examiner's description of the stab wound.

### a.  Failure to Adequately Prepare for Trial Claim

Kelly contends that his trial counsel's preparation was ineffective because he failed to visit Kelly in jail, interview eyewitnesses, and visit the crime scene. (*See* Pet'r's Mem.; RA, Ex. O.) Kelly's claim is predominately based upon the affidavit of a juror who stated that he discovered inconsistencies in the testimony of eyewitnesses based on his investigation of the crime scene. (*See* Fernandez Aff.) This claim was denied in Kelly's collateral appeal because he failed to show that trial counsel had in fact failed to do those tasks. (*See* RA, Ex. O.) Moreover, even if Kelly could show failures, the court found that he had failed to show how he was prejudiced as a result, noting that the discrepancies between the eyewitnesses' testimony and the crime scene were not so significant as to raise any doubt that they were actually present during the stabbing and had observed the struggle. (*See* RA, Ex. O.) In the instant petition, Kelly has not cured any of the defects identified in the state court proceedings. He has failed to establish that trial counsel's preparation was actually deficient in the manner alleged, and has failed to show how different trial preparation would have changed the result of the trial.

### b.  Failure to Strike Improper Expert Opinion Testimony Claim

Kelly contends that his trial counsel elicited improper opinion testimony from the medical examiner regarding the ways in which Hageman's wound could have been inflicted. (*See* Pet'r's Mem. at 3; RA, Ex. O.) Kelly argues that trial counsel posed hypothetical questions

to the medical examiner that were not based on the evidence introduced at trial, and that, as a result, he elicited testimony that Kelly had intentionally stabbed Hageman. (*Id.*) When the trial court denied this claim in Kelly's collateral appeal, the court determined that trial counsel's questions had a reasonable strategic purpose because they were intended to show that the stab wound did not match eyewitness accounts of the attack. (*See* RA, Ex. O.) Kelly has not demonstrated that the state court's finding was flawed, and the Court finds that the questioning had a reasonable strategic purpose and was intended to discredit eyewitness testimony. The Court therefore finds that Kelly has failed to establish that his trial counsel's questioning of the expert was deficient, or that he was prejudiced as a result.

### c.   Failure to Retain a Forensic Expert Claim

Kelly contends that his trial counsel should have retained a forensic expert to testify that the wound suffered by Hageman could not have been created according to how eyewitness testimony described the stabbing. (*See* Pet'r's Mem. at 4-5.) Kelly provides no evidence to support his assertion that an expert would conclude that the wound was inconsistent with eyewitness testimony, and, as a result, his claim is entirely speculative. Accordingly, the Court finds that Kelly has failed to establish that his trial counsel's failure to call an expert was deficient, and that he was sufficiently prejudiced as a result.

### d.   Failure to Object to, and Make a Record of, the Jury Demonstration Claim

Kelly contends that trial counsel's response to the jury demonstration and the trial court's curative instruction was deficient, and that he was prejudiced as a result. (*See* Pet'r's Mem. at 6-12.) Even if this particular ineffectiveness claim were not procedurally barred, the Court would recommend it be dismissed as meritless. Trial counsel's decision to accept the trial court's curative instruction had a reasonable strategic purpose. The bayonet demonstration occurred after

20

the jury had been deliberating for a few days, and it suggested that the jury was engaged in a thoughtful examination of the evidence. Accepting the curative instruction enabled the jury to continue deliberating. Moreover, Kelly has not shown how he was prejudiced by trial counsel's failing to place on the record that he had informed Kelly of the demonstration. Regardless of whether trial counsel's performance was deficient in accepting the instruction, Kelly has not shown that there was a reasonable probability the outcome would have been different but for trial counsel's performance. Indeed, the information learned from the demonstration – that the bayonet was easily removed from the sheath–was consistent with Kelly's testimony that Hageman pulled the bayonet out of the sheath before he was accidentally stabbed during the ensuing struggle.

### e. Failure to File a § 330 Motion

Kelly contends that his trial counsel should have filed a motion to vacate the judgment based on the improper jury demonstration. Even if Kelly could show that trial counsel's performance was deficient in failing to file such a motion, he has failed to show that there is a reasonable likelihood that such a motion would have been granted. As discussed previously, all the evidence before the Court indicates that it would have been denied.

In sum, after reviewing each of Kelly's ineffective assistance of counsel claims, and after examining the totality of his trial counsel's performance, the Court concludes that Kelly has not demonstrated that his trial counsel's performance was deficient and that there is a reasonable likelihood that the result of his trial would have been different had his trial counsel acted differently. Accordingly, the Court recommends that Kelly's ineffective assistance of counsel claim be **DENIED**.

### 3.    Kelly's Legal Sufficiency Claim

The Fourteenth Amendment Due Process Clause requires a defendant's guilt in a criminal trial be proved beyond a reasonable doubt for each element of the crime charged. *Jackson v. Virginia*, 443 U.S. 307, 317-18 (1979). When a conviction is challenged as based on legally insufficient evidence, the reviewing court must ask "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319 (emphasis in original).

Kelly maintains that his Fourteenth Amendment right to due process was violated because the evidence that he intended to kill Hageman was supported by legally insufficient evidence. (*See* Pet., Ex. F.) The Court finds, however, that there was sufficient evidence for a rational trier of fact to conclude that Kelly intended to kill Hageman based on the evidence presented at trial. The credible and impartial eyewitness accounts combined with the medical examiner's testimony supported the inference that Kelly intended to stab Hageman. Although Kelly testified that he struggled with Hageman over the bayonet prior to the stabbing, other witnesses with a clear view of Hageman, while obstructed from seeing the bayonet, testified that Hageman's arms remained at his side and that Kelly lunged toward Hageman after he told Kaye to call the police. A juror is permitted to infer that a defendant intended the logical consequences of his action. Stabbing a person in the chest invites a strong inference of murderous intent. Accordingly, viewing the evidence in the light most favorable to the prosecution, a rational juror could have found that the evidence established beyond a reasonable doubt that Kelly intended to murder Hageman. Therefore, the Court finds that this claim is without merit, and recommends that it be **DENIED**.

22

### 4.      Jury Demonstration Claims

Kelly asserts a variety of claims regarding how the jury demonstration and the court's response violated his constitutional rights. Kelly contends that the trial judge's failure to oversee the court officer's bayonet demonstration to the jury violated Kelly's right to have a trial supervised by a judge. (Pet., Ex F at 1.) Kelly further contends that that his rights to be present at a material stage of the proceedings and to confront the evidence presented against him were violated by the demonstration. (*See* Pet'r's Mem. at 13-14.)

### a. Judicial Supervision Claim

The right to a trial by jury "embraces the requirement that the trial be supervised in all pertinent phases by a judge and that all judicial functions be performed by that judge." *Memminger v. People of New York*, No. 05 Civ. 471 (WHP)(MHD), 2009 WL 3150766, at *11 (S.D.N.Y. 2009). In regard to the constitutional requirements of judicial supervision of a jury trial, the Supreme Court has made "sweeping statements that 'trial by jury' requires 'a jury of 12 men in the presence and under the superintendence of a judge.'" *See United States v. Grant*, 52 F.3d 448, 450 (2d Cir. 1995) (quoting *Capital Traction Co. v. Hof*, 174 U.S. 1 (1899)). The Second Circuit has interpreted the Supreme Court's recognition of the need for a judge to conduct a trial before a jury, to mean that the presence of the trial judge is necessary for "substantive conduct of functional portions of the trial," but not for "performance of mechanical repetitions." *Id.*

In this case, the Court finds that the Court of Appeals's determination that the trial judge did not abdicate his judicial authority was not contrary to, or an unreasonable application of, clearly established Supreme Court law. The officer's demonstration to the jury was unauthorized, and the trial court was unaware of it until after it had occurred. When the judge learned of the

demonstration, he immediately took control of the proceedings, and consulted with counsel to determine how to respond. With the consent of both parties, the court instructed the jury to disregard the demonstration. Based upon the trial judge's immediate and appropriate response to the unauthorized demonstration, the Court finds that the trial judge was substantially present for the substantive conduct of the functional portions of Kelly's trial. Accordingly, even if this claim was not procedurally barred, the Court would recommend it be **DENIED** as meritless.

### b.  Right to be Present at a Material Stage of the Proceedings Claim

A criminal defendant has a due process right to be present at trial "whenever his presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge." *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987) (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105-06 (1934)). "Thus, a defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." *Id.* The defendant may waive this right. *See Illinois v. Allen*, 397 U.S. 337 (1970).

Kelly contends that because he was not in the jury room when the demonstration occurred, he was denied his right to be present when a deliberating jury requested information. *See* Pet., Ex. F at 1.) The Court finds that the Court of Appeals did not act contrary to clearly established Supreme Court law when it determined that Kelly's constitutional right to be present was not violated by the demonstration. Although Kelly was not present when the demonstration occurred, he was present when his trial counsel was informed of the demonstration, when the parties discussed how the court should respond, and when the court instructed the jury to disregard the demonstration. Kelly was therefore present at the critical stages of the proceedings that dealt with the demonstration, and the court's ultimate instruction to disregard the

24

demonstration rendered it a nullity. Moreover, Kelly waived his right to be present when he accepted the curative instruction without objection. Accordingly, the Court finds that Kelly's absence from the unauthorized jury room demonstration did not violate his right to be present at a critical stage of his criminal trial. Therefore, even if the claim were not procedurally barred, the Court would recommend it be **DENIED** as meritless.

### c. Right to Confront Evidence Claim

It is well-established that "trial by jury in a criminal case necessarily implies at the very least that the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." *Loliscio v. Goord*, 263 F.3d 178, 185 (2d Cir. 2001) (quoting *Turner v. Louisiana*, 379 U.S. 466, 472-73 (1965)). As a result, courts presume that any extra-record information which jurors become aware of is prejudicial. *See United States v. Hillard*, 701 F.2d 1052, 1064 (2d Cir. 1983) (citing *Remmer v. United States*, 347 U.S. 227, 229 (1954)). That presumption, however, can be overcome by showing that the information was harmless. *Id.* Courts are required to evaluate the nature of the extra-record information and the probability of prejudice, determining "the likelihood that the influence would affect a typical juror." *United States v. Greer*, 285 F.3d 158, 173 (2d Cir. 2002); *see also United States ex rel. Owen v. McMann*, 435 F.2d 813, 818 (2d Cir. 1970). In addition, the right to confront witnesses may be waived by a defendant. *See Allen*, 397 U.S. 337.

The Court finds that the Court of Appeals's determination that the demonstration did not violate Kelly's right to confrontation was not contrary to, or an unreasonable application of, clearly established Supreme Court law. As an initial matter, the Court finds that Kelly waived this claim when he consented to the curative instruction without objection. Furthermore, as

discussed previously, Kelly has failed to demonstrate how he was prejudiced by the demonstration. The demonstration itself was something that could have been conducted by jurors, and the information gained from the demonstration—that the bayonet was easily pulled from the sheath—was consistent with Kelly's self-defense theory that Hageman withdrew the bayonet before being accidentally stabbed. Accordingly, even if the claim were not procedurally barred, the Court would recommend it be **DENIED** as meritless.

### 5. Court's Failure to Make a Full Record of the Jury Demonstration

Kelly claims that the Court's failure to make a full record of the demonstration violated his right to "notice" and "response" to a deliberating jury's request for information; deprived him of full knowledge of the officer's demonstration when he agreed to the curative instruction; and deprived him of adequate and fair appellate review by not recording his objection to the demonstration. (*See* Pet. Ex. F. at 2; R.A., Ex. D.)

A criminal defendant has a right to notice of a jury's inquiry and an opportunity to object to the court's intended response. *Rogers v. United States*, 422 U.S. 35, 39 (1975). Although Kelly was unaware of the juror's discussion with the court officer about the appropriate way to withdraw the bayonet from the sheath, he was notified about the essential details of the interaction, could have sought additional details, and was provided an opportunity to object. Furthermore, although the discussion of the demonstration was conducted off the record, the evidentiary hearing following trial provided Kelly with the opportunity to establish what occurred during the demonstration for purposes of appellate review. Accordingly, the Court recommends that this claim be **DENIED**.

26

## C. Evidentiary Hearing

Kelly argues that he should be granted a writ of habeas corpus, or, in the alternative, an evidentiary hearing to explore the "issue of ineffective assistance of counsel and or any other issue needing reviewing." (*See* Pet'r's Reply.) Where a petitioner "has failed to develop the factual basis of a claim," a federal court may not hold an evidentiary hearing unless the petitioner can show (1) that the factual predicate for his present claim could not have previously been discovered through the exercise of due diligence and (2) that "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2254(e)(2); *Channer v. Brooks*, 320 F.3d 188, 199 (2d Cir. 2003). "Diligence for the purposes of the opening clause [of § 2254(e)(2)] depends on whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court." *Williams*, 529 U.S. at 435. "Diligence will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law." *Id.* at 437. Even if the petitioner can show that he diligently pursued an evidentiary hearing in state court, the petitioner must also demonstrate that an evidentiary hearing might produce material information. *See Channer*, 320 F.3d at 199-200.

Kelly had the opportunity to fully develop his ineffective assistance of counsel claims relating to the jury demonstration during the evidentiary hearing held by Judge Allen following his first § 440 motion. He requested an evidentiary hearing with respect to his second § 440 motion, where he raised the majority of his ineffective assistance of counsel claims, but Judge Allen decided that motion without holding a hearing. Therefore, at least with respect to Kelly's ineffective assistance of counsel claims that are not connected to the jury demonstration, Kelly

27

diligently sought, and was denied, an evidentiary hearing in state court. As discussed previously, however, Kelly has failed to show how the predicate facts alleged in his ineffective assistance of counsel claims would have established by clear and convincing evidence that Kelly did not intend to kill Hageman. Accordingly, the Court recommends that Kelly's request for an evidentiary hearing be **DENIED**.

## IV. CONCLUSION

For the foregoing reasons, I recommend that Thomas Kelly's petition for a writ of habeas corpus be **DENIED**. Pursuant to Rule 72, Federal Rules of Civil Procedure, the parties shall have fourteen (14) days after being served with a copy of the recommended disposition to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies delivered to the chambers of the Honorable Barbara S. Jones, 500 Pearl Street, Room 1920, and to the chambers of the undersigned, 500 Pearl Street, Room 1970. Failure to file timely objections shall constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. *See Thomas v. Arn*, 474 U.S. 140, 150 (1985); *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989)(*per curiam*); 28 U.S.C. § 636(b)(1) (West Supp. 1995); Fed. R. Civ. P. 72, 6(a), 6(d).

**Dated: April 7, 2011**
**New York, New York**

Respectfully Submitted,

The Honorable Ronald L. Ellis
United States Magistrate Judge

28

**Copies of this Report and Recommendation were sent to:**
*Pro Se* Petitioner
Thomas Kelly
Five Points Correctional Facility
Caller Box 400
State Route 96 A
Romulus, NY 14541

Counsel for Respondent
Eleanor J. Ostrow
District Attorney, New York County
One Hogan Place
New York, NY 10011